## Crawford *against* The Commonwealth.

The same security which is afforded by an administration bond to the heirs of an intestate results to the commonwealth in the case of the death of an intestate without heirs or known kindred.

In case of an intestacy without heirs or known kindred, the commonwealth can not maintain a *scire facias*. upon a judgment obtained against the administrators on their administration bond to recover the personal estate, without first having established her right by an inquest confirmed by the court.

ERROR to the common pleas of *Mifflin* county.

This was a·*scire facias* upon·a judgment obtained upon an administration bond, in which "The Commonwealth, for escheat on information of *Daniel Rodebaugh*," was plaintiff, and "*David Crawford* and *Joseph Douglass* surviving obligors in a bond with *James Mackey* and *William Beale*, Esq." were defendants ; on the trial of which the following facts appeared in evidence.

*Henry Doran*, late of Mifflin county, died intestate, and as was alleged without any known kindred. Upon his death letters of administration were granted by the register of the county to *David Crawford* one of the plaintiffs in error, and *James Mackey* since deceased, who gave an administration bond in the usual form, with *Joseph Douglass* the other plaintiff in error, and *William Beale*, as their sureties. No administration account being settled in conformity to the condition of this bond, a suit was afterwards brought upon it against *David Crawford* and *Joseph Douglass* ; *James Mackey* and *William Beale* having both died in the mean time ; to January term 1823, in the court of common pleas of Mifflin county, in which a cautionary judgment was obtained against them for the amount of the penalty of the bond.

On the 9th of August 1821, the auditor-general of the state, upon the information of *Daniel Rodebaugh*, according to the directions of the first section of the act of assembly, entitled "a supplement to an act entitled an act to declare and regulate escheats," passed the 2d of April 1821, appointed *James M'Dowell*, Esq. of Mifflin county, his deputy, who issued his precept to the sheriff of the county, commanding him to summon and empannel twenty-four good and lawful men of the same county, to come before the said deputy at the place and on the day therein mentioned ; to inquire whether the said *Henry Doran* had died without heirs or known kindred ;·and whether he, at the time of his' death, was seised or possessed of any, and what estate, real or personal in the same county ; and also in whose hands or possession the same was. In pursuance of this precept an inquisition was taken on the 28th of December 1821, which was certified, and transmitted by the deputy of the auditor-general into

[Crawford v. The Commonwealth.]

the office of the prothonotary of the common pleas of Mifflin county. The inquest found, that *Henry Doran* died on the 25th of November 1815, intestate, and without heirs or any known kindred ; and that he was possessed at the time of his death of personal estate in Mifflin county of the value of 1146 dollars and 99 cents, which had escheated to the commonwealth of Pennsylvania ; and after enumerating or specifying of what it consisted, they also found that it had come into the hands of *David Crawford* and *James Mackey* administrators of *Henry Doran,* and had been eloigned by them.

At the time of taking this inquisition. *James Mackey* was dead ; and *Mary Mackey,* his widow, who was the executrix of his last will, joined *David Crawford* in giving a bond with security to the commonwealth, to appear at the next court of common pleas to be held for the county of Mifflin, to traverse the inquisition, and in case the same should be confirmed, to render to the commonwealth the estate found to have been in their hands or that of *David Crawford* and *James Mackey.* A certificate to this effect was given, and indorsed by the deputy of the auditor-general upon the inquisition when it was transmitted by him into the prothonotary's office, and is in the following words : " To *Robert Craig,* Esq. prothonotary, court of common pleas of Mifflin county ; I do hereby certify that the above inquisition, in pursuance of the annexed writ, was held, signed and sealed as set forth in the same, and that *Mary Mackey and David Crawford have given bond to traverse the inquisition. James M'Dowell,* deputy auditor-general."

The following entries were made in the docket of the prothonotary of the court of common pleas of Mifflin county, to wit :

" *The Commonwealth of Pennsylvania* v. *Mary Mackey, Executrix of James Mackey deceased,* January term 1822. No. 150. Writ of inquisition of escheat on the estate of *Henry Doran* deceased, April term 1822. Bond of defendant filed, and the bail excepted to. Rule to justify by the court.

" *Commonwealth of Pennsylvania* v. *David Crawford,* No. 151, same term. Writ of inquisition of escheat on the estate of *Henry Doran* deceased. Bond of defendant filed, and the bail excepted to. Rule to justify by the court."

Here all further proceeding upon this inquisition closed.

The counsel for defendants requested the court to charge the jury on the following points.

1. That no damages can be recovered in this suit in the name of the *Commonwealth ex relatione Daniel Rodebaugh* ; as neither the informer nor the commonwealth, in case of escheated articles, have any remedy on the administration bond against the administrators or their bail ; but must pursue the method pointed out by the act of assembly relative to escheats, to obtain possession of the escheated property.

2. That in this case no writ of seizure issued on the inquisition of escheats, to seize the property of *Doran* in the hands of *Crawford* and

3 L

[Crawford v. The Commonwealth.]

*Mackey,* or to seize their own property, as directed by the act of assembly; no damages can be recovered against *Joseph Douglass,* the bail in this case.

3. That by return of the inquisition and the power given the commonwealth to issue a writ of seizure, to take into the custody of the law the property of *Doran,* or the property of *Crawford* and *Mackey,* it was imperative on the commonwealth to do so, and the neglect to issue this writ of seizure discharged *Joseph Douglass,* the bail.

4. That the proceedings in suits No. 150 and No. 151 of January term 1822, preclude the maintenance of this suit until those proceedings are finally disposed of.

5. That neither *David Crawford* nor *Mary Mackey* had legal notice of the time or place of holding the inquisition of escheat : the plaintiff cannot recover.

6. That the finding of the inquisition is uncertain, and such.a finding as no legal process could be issued upon it.

7. That the finding of the inquest was, that the property was eloigned; but they do not find by whom it was eloigned.

8. That the *scire facias* in this case must issue at the instance of some person aggrieved, and that *Daniel Rodebaugh* has not so conducted the proceedings in this case as to enable him to maintain this suit.

1. To the first point the court answers, that it is their opinion the bond given by the administrators and their bail does stand for the use of all persons interested in the personal property to be administered; that the bond covers the right of the commonwealth when personal property has escheated, and when it.has been converted into money by administrators; and that when the inquest was found, and the property declared escheated, the commonwealth, on the relation of the informant, might proceed to recover the escheated personal property which was received by the administrators in due administration in this way.

2 and 3. That in this case a writ of seizure was not necessary; nor can we instruct you that *Douglass* was discharged, because that writ did not issue; nor was it imperative on the commonwealth to issue a writ of seizure when the property was legally in the possession of *Mackey* and *Crawford* in the course of administration.

4. We do not think the proceedings on suits No. 150 and No. 151 of January term 1822, preclude the maintaining of this suit.

5. The very suits, No. 150 and.No. 151, given in evidence by defendant, show, that they had notice of the inquest. The escheatorgeneral swears he believes *Crawford* was present; we have said and offered to admit evidence by defendant of any payment that may have been made by the administrators; nay, we instruct you to allow for administering the estate, although no inventory has ever been filed, nor administration account settled.

6. We think the finding sufficiently certain to call upon the defendant to show what became of the estate.

[Crawford v. The Commonwealth.]

7. The finding was, that the sum of 1146 dollars and 99 cents was in the hands of the administrators, and has been by them eloigned. This we think is finding by whom eloigned.

8. We think the *scire. facias* well issued. *Rodebaugh* might or might not be named in this case ; this suit we instruct you can be maintained. The money goes into the state treasury. *Rodebaugh,* if he receives any of it, gives bond for it agreeably to law. We cannot instruct you as required.

This opinion of the court was assigned for error.

*Parker* and *Potter,* for plaintiffs in error.
*M'Dowell,* for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—On the trial of this cause in the court below, several bills of exception were taken by the counsel for the plaintiffs in error, to the opinion of the court, admitting evidence offered by the defendant in error and objected to by the plaintiffs in error, which have been assigned among other matters for error here. We however perceive no error in them. The court below was so obviously right in admitting the evidence, that it requires no reasoning in order to make it more palpable.

The other matters involved in the errors assigned, which seem to be worthy of notice, may be reduced to two questions.

First. Are the commonwealth and her informer entitled to maintain a writ of *scire facias* upon a judgment had upon an administration bond, to recover the value of the personal estate of the intestate, which came into the hands and possession of the administrators, and to which she has a right by escheat?

Second. If she has a right to maintain a writ of *scire facias* for such purpose, can she do it without first having her right established by means of an inquest; and if after that, a bond and security be given to her by the administrators to traverse the inquisition, can she maintain such suit before that the inquisition shall be confirmed?

In respect to the first question, it may be premised, that it has never been questioned, but that the next of kin to the intestate might maintain an action on the administration bond against the administrators and their sureties, to recover their respective proportions or purparts of the intestate's personal estate, which came into the hands of the administrators. Although it was at one time held in England that the creditors of the intestate could not sue and recover upon the administration bond given there, of which ours is a copy, even in the case of a *devastavit* by the administrator; yet it was ever considered, that the bond was given especially, and at this time exclusively for the benefit of the next of kin or those entitled to have the personal estate of the intestate, which remained after paying his debts and the expenses of the administration. It has however been adjudged since, that in England, as also in this state, that a creditor, in case

[Crawford v. The Commonwealth.]

of his being unable to collect his debt of the administrator on account of his having committed a *devastavit*, may have an action upon the administration bond against the sureties by way of redress. This being the settled law, where there are next of kin, it must be obvious to every one, that where there are none, that the commonwealth comes in lieu of them; and why shall she not be entitled to the same security and the same remedy, having asserted and established her right to the estate by escheat, in the manner prescribed by law, that are given to the next of kin? I must confess that I am unable to perceive any. The commonwealth in such case may well be considered the *ultima hæres*, and as succeeding to all the rights and all the remedies of the heirs or next of kin in ordinary cases. The application of this principle may perhaps appear more striking in the case of a bastard's dying intestate, than that of any other. According to the common law, which remains unaltered in this particular by statute, he has no heir or next of kin. He is *nullius filius*, and in England the king is considered to be his heir, *ultimus hæres*. By the civil law a bastard was deemed *filius populi;* and here I see no good reason why he may not be denominated *filius reipublicæ*, and upon his dying intestate, the commonwealth be looked upon as his next of kin, under our acts of assembly regulating and declaring in what cases the estates of intestates shall escheat. But it has been argued that as the act of the 29th of September 1787, entitled "an act to declare and regulate escheats," directs, by the fourth section thereof, a course of proceeding against the party himself directly, in whose hands or possession the estate shall be found, that that is the only remedy which the commonwealth has or can resort to. This section declares that immediately "upon the finding of the inquisition, the escheator-general [now the auditor-general or his deputy, by the act of the 2d of April 1821, sec. 1] shall issue his writ, directed to the sheriff or coroner of the county, as the case shall require, commanding him to seize, attach and secure the goods and chattels so found to be escheated as aforesaid, in whose hands soever the same shall be found; or if it be found by the said inquest that the said goods and chatters be eloigned, then to seize and attach so much of the goods and chattels of the person or persons who shall have eloigned the same, as shall be equal in value to the goods and chattels which he eloigned, unless the person or persons in whose hands or possession such goods and chattels be found, give bond to the commonwealth, with sufficient security, to appear at the next supreme court [but, since the act of the 2d of April 1821, at the next court of common pleas] thereafter, to traverse the said inquisition, and likewise, in case the same be confirmed, to render to the commonwealth the same goods and chattels found to be in his or her hands; which writ, so to be issued, shall be duly returned to the escheator [now auditor] general, together with an inventory and appraisement of the goods and chattels, if any, which he seized and attached by virtue thereof; and the said sheriff or coroner shall there-

[Crawford v. The Commonwealth.]

upon sell the same goods and chattels at public auction, after ten days public notice of such sale, and shall, without delay, pay over the moneys therefrom arising, to the treasurer of the commonwealth, &c." In answer to this, it is sufficient to observe, that although a very summary remedy is given by this act to the commonwealth to obtain possession of the personal estate of which the intestate died possessed, or otherwise an adequate compensation for it in case it should be eloigned, yet there are no words in the act which seem to indicate the slightest intention, upon the part of the legislature, to confine the commonwealth to that course of proceeding alone, or to prevent her from pursuing any other that another party interested in the estate, and having a right to it, would be entitled to select and adopt. The commonwealth being once invested with the right to the estate, the law will afford her, as incident to such right, every remedy provided generally for the recovery of it; whether it be a remedy existing at common law, or be given by statute; and the remedy furnished to the commonwealth in this particular case by the act of assembly, must be considered cumulative, which she may pursue, in proper cases, as often as it is likely to prove effectual, at pleasure.

I come now to the consideration of the second question. It appears to me, that wherever the commonwealth intends to assert her right by escheat to the estate of an intestate, that it must be done by means of an inquest, as directed by the acts of 1787 and 1821 already referred to, and in part recited; and that until her right shall be established by the report of the inquest in her favour, she can maintain no action, nor cause any writ to be issued, for the recovery of the possession of the property. But having established her right of property by an inquest of office found in her favour, she may have all the personal property secured, if not eloigned, or, if found by the inquest to be eloigned, have other property of the party who eloigned it, of equal value, taken in place thereof, by the sheriff or coroner of the county, under a writ to him directed for that purpose, from the deputy of the auditor-general, according to the acts of assembly cited above; or she may commence and prosecute, for the recovery of the same, any action that the next of kin, had there been any, would have been entitled to support. Indeed, I think it is very manifest, from the provisions of these acts, that the legislature, instead of intending to restrict and limit the commonwealth, in her course of proceeding to obtain possession of the goods and chattels belonging to, or to recover the debts owing to an intestate who died without heirs or any known kindred, within what is allowed by law to heirs or next of kin where there are such, that they intended to extend it beyond any thing that these latter can claim; for by the eighth section of the act of 1787 it is expressly declared, that after it shall have been found by the inquest, that the intestate died without heirs or any known kindred, the commonwealth shall be entitled to recover for her use, " by information of debt or action in the nature of

[Crawford v. The Commonwealth.]

trover and conversion, or upon the case, for money had and received, as the case may require," any part of the personal estate of such intestate or moneys owing to him, and not mentioned or included in the inquisition, in the hands or possession of or owing by any person dwelling within the state. · Thus enabling the commonwealth, after the inquest of office found in her favour, to demand and recover the goods and chattels belonging to the intestate at the time of his decease, from those in whose possession they may be, and the debts or moneys owing to the deceased from the debtors, whoever they may be; while the next of kin, when there are any, are confined, and compelled to claim every thing of the kind, through and by means of the administrators, without whom the personal estate cannot be collected and secured.

Although the commonwealth, after an inquisition held establishing her right by escheat to the personal property of an intestate, enumerating it specifically, and finding it to be in the hands of administrators, within the year after the decease of the intestate, would seem, according to the letter of the act of 1787, to have a right to seize and take the property immediately out of the hands and possession of the administrators, even before the expiration of the year, the time that is allowed by subsequent acts of assembly, for ascertaining the creditors of the intestate, if there should be any, the amount of their claims, and for paying them off; yet I am inclined to think, that in such case, no writ for seizure of the goods or property can be issued or executed until after the year. It is evident, from the second section of the act of 1787, which, among other things, declares that the " estate shall escheat to the commonwealth, *subject to all legal demands on the same,*" that the legislature did not intend to preclude the creditors of the intestate from being paid their claims out of his estate ; but as no mode is provided by this or any of the subsequent acts on the subject of escheat, whereby creditors shall obtain payment of their debts out of the estate of the intestate, nor yet any agent or officer of the commonwealth thereby authorized to make payment to them, of their debts, out of the estate of which their debtor died seised or possessed, may it not be fairly presumed, or inferred, that the legislature intended that this should be done by administrators, were there any ? otherwise, to take the estate out of the hands of the administrators before the expiration of the year, the time allowed in all cases for paying the debts of the deceased debtor before distribution shall be made amongst the next of kin, might prevent creditors from receiving payment of their debts ; and if so, would certainly defeat the intention of the legislature, as it appears to me ; which was, that the commonwealth should only be entitled to claim the surplus of the intestate's estate, which should remain after payment of all his debts. In cases, however, where no letters of administration have been granted upon the estate of the intestate, I do not consider that the commonwealth is bound, after having established her right to the property by the report of an in-

[Crawford v. The Commonwealth.]

quest, to delay a moment in proceeding to seize upon and take possession of it. For if creditors should become embarrassed in obtaining payment of their debts by it, they must attribute it to their own negligence, in not having taken out letters of administration, as they had a right to do, before the commonwealth had established her right to the property. Although I incline to entertain this opinion at present, yet I do not wish to be understood as being entirely free from doubt in regard to its correctness; nor, that I shall consider myself bound by it hereafter, in a case where it may become necessary to decide the point; for in this case it does not necessarily arise, as much more than one year elapsed after administration was taken out upon the estate of *Henry Doran*, before the commonwealth moved at all in the business. But still, notwithstanding that greatly more than the year had elapsed, and that the commonwealth was not prevented, on that ground, from proceeding, upon the return of the inquisition in her favour, to issue a writ from the deputy of the auditor-general, directed to the sheriff, commanding him to seize the goods and chattels of the administrators, equal, in value, to the personal estate of the intestate which the inquest found came to their hands and had been eloigned by them, and to dispose of them for the use of the commonwealth, in the manner prescribed by the act of 1787; I think that the bond given by *David Crawford*, the surviving administrator, and *Mary Mackey*, the executrix of *James Mackey*, the deceased administrator, to the commonwealth, with security, to traverse the inquisition, arrested all further proceeding on the part of the commonwealth, until the traverse thus taken was finally disposed of, and the inquisition confirmed. By this traverse of the inquisition, every fact found by it was denied, and put in issue; and not merely the fact, as has been alleged, that the administrators had eloigned the estate which came into their hands, but the fact, that the intestate died without heirs, or any known kindred, as well as every other fact found by the inquest, which was material to entitle the commonwealth to the estate of the intestate, was denied, and completely put in issue by the traverse. The traverse of an inquisition, *ex vi termini*, is a denial of all the facts found by it. This being the case, it follows that the presumption of right, on the part of the commonwealth, which arose from the finding of the inquest, was repelled by the traverse; and until the inquisition should be confirmed, either upon a trial of the traverse or upon its being dismissed for sufficient cause, the right of the commonwealth to the estate of the intestate could not be said to be established; nor do I conceive, that according to the terms of the act of 1787, that she had any right to have a writ under that act to seize the property, or that she could maintain an action in any form against the administrators or their sureties, or any other person whomsoever, for the estate of the intestate, or any part of it, except to prosecute a trial of the traverse, and to have the inquisition confirmed first.

It, however, has been contended, that because an exception was

taken to the sufficiency of the security given in the bond for the traverse of the inquisition, it ought to be considered as if no traverse had ever been taken, or existed.   But it appears that the bond, with the security, was certified by the deputy himself of the auditor-general, to have been given without any objection being made by him then to the sufficiency of the security.   This certificate was made on the back of the inquisition, and was transmitted with it into the prothonotary's office by the deputy of the auditor-general ; and no exception entered or taken to the sufficiency of the security, until some time, at least one term, three months, afterwards.   During this interim, there is no pretence for saying, that the traverse was not regularly and well taken and entered.   The administrators had done all that the act required, in order to complete their traverse. Now admitting that the exception to the sufficiency of the security entered after that the bond had been so taken to the commonwealth by the deputy of the auditor-general, and so certified by him to the prothonotary, without any exception at the time, was all regular ; still the traverse must be considered as still pending, until that the sufficiency or insufficiency of the security was decided on by the proper tribunal, and the traverse dismissed, and the inquisition confirmed, for want of sufficient security ; or, otherwise, the traverse tried, and the inquisition thereupon confirmed.   As I, then, consider that the traverse was regularly and well taken in this case, for any thing that appears to the contrary, and as the inquisition has never been confirmed in any way, the commonwealth was premature in suing out the writ of *scire facias ;* and cannot maintain this action. But the court below having given a contrary direction to the jury on this point, their judgment must, therefore, be reversed.   In all other respects or matters, I think, that the direction of the court below to the jury, and their answers to the points submitted by the counsel for the plaintiffs in error, were right.

The judgment is reversed.